IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Ty'Ran Tyrell Dixon, | ) | |
| | ) | C/A No.: 3:25−cv−09847-JFA-SVH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **CIVIL RIGHTS COMPLAINT** |
| Steven W. Griffith, Matthew Davis, Noah | ) | **(Jury Trial Demanded)** |
| Klienholz, Carlos Colindres, and Shawn | ) | |
| Murray, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Ty'Ran Tyrell Dixon ("Dixon") was wrongfully taken into custody, seized and detained for sixty-seven (67) days, by reason of Defendants Steven W. Griffith, Matthew Davis, and Noah Kleinhoz of the Barnwell County Sheriff's Department ("BCSD"), Defendant Carlos Colindres of the City of Aiken Public Safety Department ("Aiken PD") and Defendant Shawn Murray of the South Carolina Department of Law Enforcement Division ("SLED") (hereinafter "Defendants"), actions, failures, and omissions, and, thereafter, multiple occurrences of additional acts and omissions by Defendants, beginning with Dixon's innocent arrival at Logan International Airport in Boston.

On September 30, 2024, Dixon, a South Carolina native and professional football player, was traveling from Finland to his home in Columbia, South Carolina. While in the airport, Dixon was approached and detained by law enforcement and advised of warrants for his arrest for murder and serious felonious injuries, which occurred in Barnwell, South Carolina, on October 15, 2023. Notwithstanding his protestations of innocence (which were continuously restated over the ensuing sixty-seven days), informing the federal authorities there was a mistake as he had never been to Barnwell, South Carolina, knew nothing of the criminal incident, and had no criminal

record whatsoever, Dixon was taken into custody. He was handcuffed in front of dozens of passengers deplaning, walked through the public areas of Logan International Airport in handcuffs, then crammed in a holding cell and detained overnight in a Massachusetts State Police facility. The following day, Dixon was taken to Court and immediately waived extradition, again stating his innocence and reiterating his continuous denials of knowledge of the events for which he was charged. That day, September 30, 2024, was the beginning of Dixon's wrongful sixty-seven-day detention and the deprivation of his liberty. During that time, Dixon was in the custody of the U.S. Marshals Service who shuffled Dixon in full handcuffs by air and automobile from places of continuous detention in the Suffolk County Detention Center, then to South Bay Jail in Boston, Massachusetts, then to Donald W. Wyatt Detention Center in Central Falls, Rhode Island, then to Grady County Jail in Chickasaw, Oklahoma, then to Irwin County Georgia Detention Center in Ocilla, Georgia.

During his unlawful imprisonment, Dixon was threatened by inmates, spent nights in agony, anxiety, fear and in prayer, was subjected to travel on "Con Air", and was placed in solitary confinement for his own protection. Dixon's family and representatives continuously pled to BCSD for the immediate transportation of Dixon back to South Carolina since the arrest warrant was for the wrong person. During this time, BCSD traveled to Massachusetts to obtain Dixon's phone as evidence but left Dixon to suffer out of state confinement.

Finally, on December 6, 2024, Dixon arrived in South Carolina in the custody of law enforcement and was transported to the BCSD for booking. Upon his arrival and within minutes of talking with the officers, Dixon was advised a "mistake" had been made and he was released from custody.

During Dixon's time in these successive detention facilities, Dixon was humiliated, threatened, terrified, and endured the "special unendurable hell" of wrongful accusation, wrongful seizure, wrongful detention, and the uncertainty of his future.  The wrongful actions of multiple law enforcement agencies began on the date of September 30, 2024, and resulted in a succession of multiple occurrences of negligence, or intentional failure, of acts and omissions which give rise to this action.

The Plaintiff, Ty'Ran Tyrell Dixon respectfully alleges as follows:

## PARTIES AND JURISDICTION

1. Plaintiff Ty'Ran Tyrell Dixon ("Dixon" or "Plaintiff Dixon") is a citizen and resident of Richland County, South Carolina.  Until September 30, 2024, Dixon had never been arrested or charged with any criminal violation.

2. Defendant Noah Klienholz is employed with BCSD and assisted in the investigation, wrongful identification and arrest of Dixon. Upon information and belief, Defendant Klienholz is a citizen and resident of Barnwell County, South Carolina. Defendant Klienholz is named as a defendant in his individual capacity under 42 U.S.C. § 1983 federal cause of action for his acts and omissions that proximately caused the injuries and damages to Dixon.

3. Defendant Matthew Davis is employed with BCSD and assisted in the investigation, wrongful identification and arrest of Dixon. Upon information and belief, Defendant Davis is a citizen and resident of Barnwell County South Carolina. Defendant Davis is named as a defendant his individual capacity under 42 U.S.C. § 1983 federal cause of action for his acts and omissions that proximately caused the injuries and damages to Dixon.

4.    Shawn Murray is employed with SLED and assisted in the investigation by specifically participating in multiple witness interviews in which a "Tyren Priester", "Tyren Dickson," "Tyren Dickerson," and "Tyren Dixon," (phonetically spelled) were identified. Upon information and belief, Defendant Murray provided the driving record for Ty'Ran Dixon to Defendant Klienholz and Davis. Upon information and belief, Murray is a citizen and resident of Richland County, South Carolina.   Defendant Murray is named as a defendant in his individual capacity under 42 U.S.C. § 1983 federal cause of action for his acts and omissions that proximately caused the injuries and damages to Dixon.

5.    Carlos Colindres is employed by Aiken PD and assisted in the investigation and wrongful detention of Dixon. Upon information and belief, Defendant Colindres is a citizen and resident of Aiken County, South Carolina. Defendant Colindres is named as a defendant in his individual capacity under 42 U.S.C. § 1983 federal cause of action for his acts and omissions that proximately caused the injuries and damages to Dixon.

6.    Sheriff Steven W. Griffith is the elected Sheriff of Barnwell County and controls the entire operation of the BCSD. Defendant Griffith is named as a defendant in his individual capacity under 42 U.S.C. § 1983 federal cause of action for the implementation of policies, customs, and practices that proximately caused the injuries and damages to Dixon.

7.    Plaintiff invokes this Court's jurisdiction due to the claims arising under federal statutes 42 U.S.C. §§ 1983, 1985, 1988, and the Fourth and Fourteenth Amendments of the United States Constitution.

8.    Jurisdiction and venue are proper in this Court.

4

## **JURY TRIAL DEMAND**

9. Dixon demands a jury trial on all causes of action.

## **FACTUAL ALLEGATIONS**

10. Around 12:45 am on October 15, 2023, Jasmine Roach was shot and killed in a shooting incident that occurred at a party on Quail Road in Barnwell, South Carolina.

11. Barnwell County Sheriff's Department, Aiken Public Safety Department, and the South Carolina Law Enforcement Division were involved in the investigation into the death of Jasmine Roach.

12. Within 12 hours of the shooting, at around noon on October 15, 2023, Sheriff Steven Griffith was told by a highly credible source that the alleged shooter was "Tyren Dickson." Sheriff Steven Griffith was also provided the picture of Tyren Dickson and his social media profiles.  Attached as Exhibit A are the text messages that Sheriff Steven Griffith received, and as shown below:




13.     Upon receipt of the text messages identifying with specificity the actual suspect identified by name by multiple witnesses, the failure of Sheriff Griffith and the Defendants to properly pursue the information and immediately apprehend the actual suspect left the entire community and State at risk of the commission of further violent and illegal acts for 15 additional months.

14.     During the investigation conducted by Defendant Shawn Murray of SLED, Defendant Murray also identified "Tyren Dickson," "Tyren Dickerson," and "Tyren Dixon," (phonetically spelled) as a potential suspect.  Upon information and belief, in no interview of witnesses where the assailant was identified, did any law enforcement officer make any effort to obtain a description of the suspect from those who knew him (and those who did not), to request

6

a name spelling of the suspect, or make any effort to gather other identifying physical evidence or to utilize a police sketch artist to create a rendering.

15.     Of the various names, Defendant Shawn Murray pulled the driving record of Plaintiff Dixon and inserted a screenshot of his driving record report with Dixon's photograph and identifying information of Dixon into a suspect chart.

16.     The SLED Suspect Chart was created on October 24, 2023 at the direction of Defendant Shawn Murray, which did not include Tyren Dickson.

17.     To Plaintiff's knowledge, none of the other alternate spellings provided were investigated and the arbitrary choice of Defendant Shawn Murray to only pull information on Dixon, resulting in the omittance of readily available information for the actual person they were seeking to investigate, Tyren Dickson.

18.     Defendant Shawn Murray did not receive any information, including any witness statement, that Plaintiff Dixon was a suspect, and at no time did Defendant Shawn Murray provide any witness with a picture of Plaintiff Dixon for identification purposes, despite the fact there were numerous witnesses to the shooting – including some who knew Dickson by name.

19.     Defendants Matthew Davis and Noah Klienholz of BCSD did not follow their fundamental law enforcement training in failing to show any witness with knowledge of the incident or who knew the actual suspect, Tyren Dickson, a picture or photo array of Dixon as a suspect for identification purposes.

20.     Defendant Carlos Colindres of Aiken PD did not show any witness with knowledge of the incident or who knew the actual suspect, Tyren Dickson, a picture of Dixon for identification purposes for purposes of seeking an arrest warrant.

21.     On the morning of August 14, 2024, Defendant Klienholz interviewed Richard Garvin, a witness to the shooting incident.  Richard Garvin said the person who shot Jasmine Roach was Tyren Dickson.  Garvin's identification of Tyren Dickson matched what Sheriff Steven W. Griffith was told within hours of this shooting.  During this interview, Richard Garvin was never shown a picture of Dixon or Tyren Dickson for identification purposes and was never shown pictures thereafter until after the charges were withdrawn against Plaintiff Dixon, after he was exonerated as a suspect.

22.     Richard Garvin never identified Plaintiff Dixon as a suspect in this murder.

23.     Acting on the failed investigation, on the afternoon of August 14, 2024, Defendant Kleinholz, lacking probable cause, swore out affidavits and obtained arrest warrants (Warrant No. 2024A0610400282 and 2024A0610400283) for Murder and Attempted Murder against Plaintiff Dixon for the alleged murder of Jasmine Roach, on October 15, 2023, in Barnwell County.

24.     The warrants for the arrest of Dixon were the product of fundamental police investigative failures, and shoddy, incompetent, and utterly inexcusable actions of the Defendants, demonstrating a heartless disregard for the impact of their actions against an innocent Plaintiff Dixon.

25.     Defendants obtained these warrants by omitting and misrepresenting material information and ignoring readily available exculpatory evidence. No officer using reasonable care and employing best practices and standard identification verification techniques would have applied for arrest warrants of Dixon under the circumstances.

26.     In obtaining the arrest warrants, Defendants made no effort to confirm the identity of the perpetrator by utilizing photograph identification with witnesses of the shooting, obtaining ballistic evidence, forensic evidence, fingerprint evidence, surveillance evidence, photographic

evidence, confessional evidence, or any other credible evidence that would link Dixon to the murder of Jasmine Roach, all prior to seeking a warrant of murder against the wrong man and initiating a nationwide manhunt for the wrong man— an innocent man.

27.     Mere weeks after Plaintiff Dixon's unlawful detention began, his family and their private investigator made efforts to provide facts and witnesses to prove his whereabouts (his alibi) at the time of the murder which law enforcement chose to ignore.

28.     In obtaining the arrest warrants, Defendants did not question witnesses nor show any photographs of the actual assailant for comparison to Plaintiff Dixon to potential witnesses or provide age, weight, height, and appearance descriptions of Dixon to anyone purporting to have knowledge of the murder of Jasmine Roach.

29.     Defendants ignored readily available exculpatory evidence, including evidence that was publicly available on social media, that would have proven Dixon was not involved or associated in any manner with the murder of Jasmine Roach.

30.     The Defendants did not contact or interview Dixon, nor anyone in his family, to investigate his likely involvement in the murder of Jasmine Roach.

31.     Dixon had nothing to do with the murder of Jasmine Roach.  On October 15, 2023, Dixon was attending Newberry College homecoming, a fact known to dozens of available witnesses, and a fact made known to Defendants soon after Plaintiff Dixon's arrest by several sources.

32.     Dixon had never been to Barnwell County in his entire life.

33.     A simple Google or social media search of Dixon's name would have revealed that he was a prominent student-athlete at Newberry College pursuing a football career, and that his age, build, and physical description did not match the alleged suspect.

34.    A Google search of "Ty'Ran Dixon" would have revealed the following results:



35.    On August 23, 2024, just 9 days after the arrest warrant issued against Dixon, Defendant Colindres sent the following email to Defendant Davis with the subject line "Tyren Dickson" questioning if they had arrested "the right guy":

| From: | Carlos Colindres |
| --- | --- |
| Sent: | Friday, August 23, 2024 10:41 AM |
| To: | Matt Davis |
| Subject: | Tyren Dickson |
| Attachments: | T. DICKSON.pdf |

Hey man, I was wondering if you or someone with your department can do me a big favor. I just want to make sure we have the right guy so if someone could run up to your jail and show Garvin this DMV photo without showing the name and info and see if Garvin will identify him as Tyren Dickson. I'm meeting with the solicitors office next week sometime and I'll probably be charging Dickson soon. Garvin already identified his name in two interviews we just need him to visual confirmation that this is him.

Thanks,
Carlos

The email contained an attachment "T. Dickson.pdf" that was the 3 Year Driver Record of the actual suspect, Tyren Romell Dickson.



36.     Defendants knew that the actual suspect was named "Tyren Dickson" not Ty'Ran Dixon

37.     Even after Defendants had sworn out an arrest warrant for Dixon, Defendants continued to doubt whether they had arrested the "right guy."

38.     Defendant Colindres never went to the jail to show Richard Garvin the picture of the correct defendant even after the August 23, 2024 email.

39.     Despite this email from Defendant Colindres, Defendant Davis never went to the jail to show Richard Garvin the picture of the correct suspect.

40.     Despite this email from Defendant Colindres, Defendant Kleinholz never went to the jail to show Richard Garvin the picture of the correct suspect.

41.     The arrest warrant for Dixon was entered into the National Crime Information Center (NCIC), centralized database used by law enforcement agencies to share information about wanted persons.

42.     After completing his first season as a professional football player in Finland, on September 30, 2024, Dixon flew into Logan International Airport in Boston, Massachusetts with the intention of continuing his travels to his home in Columbia, South Carolina.

43.      Almost immediately upon deplaning, Dixon was confronted by Massachusetts State Police, who advised there was a warrant for his immediate arrest per the NCIC database. Dixon was immediately handcuffed, and his belongings were surrendered to law enforcement. This occurred within full view of the public in the concourse/gate area and was observed by airport employees and passengers.

44.     Prior to Dixon arriving at the Logan International Airport, Defendant Davis confirmed with Massachusetts State Police that the arrest warrant against Dixon was valid.

45.     The officers from Massachusetts State Police told Dixon that he was a "wanted person" based on an outstanding warrant for his arrest from South Carolina. Dixon was taken to a holding facility while all of his luggage and belongings were confiscated and searched. He was subsequently placed in a holding cell overnight to await a hearing before a Massachusetts judge. Dixon was put behind bars without being told the nature of his charges or the reason for the arrest.

46.     Dixon began to have severe panic and anxiety attacks, all the while not knowing why he was being jailed.

47.     On October 1, 2024, Dixon appeared in a Massachusetts courtroom and learned that he was being held for first degree murder charges from Barnwell County, South Carolina based on a BCSD warrant. Dixon explained to law enforcement and court personnel the purpose of his travel from Europe, his innocence of any wrongdoing, and that he had never been to Barnwell County in his life.

48.    Dixon voluntarily signed a Waiver of Extradition with the expectation of an immediate return to South Carolina, with Judge DelVecchio ruling that "S.C. can pick [Dixon] up directly."

49.    From that courtroom, Dixon was transported to the Suffolk County Detention Facility on Nashua Street to be picked up by the BCSD.

50.    Defendants Noah Klienholz and Sheriff Steven Griffith were notified of Plaintiff Dixon's arrest and detention by the Massachusetts State Police at Logan International Airport on September 30, 2024.  They were further advised that Dixon signed a Waiver of Extradition on October 1, 2024.

51.    Deputies of BCSD traveled from South Carolina to Massachusetts with instructions from Defendants Klienholz and Griffith to only inspect Dixon's belongings and retrieve his cell phone for inspection.

52.    This call, once in the possession of Defendnats could have been reviewed by search warrant or Plaintiff Dixon's request (had he been asked) which would have revealed the exculpatory evidence of his alibi.

53.    Defendants Klienholz and Griffith could have, and should have, instructed the BCSD Deputies to transport Dixon from Massachusetts back to Barnwell County to serve and process the warrant. However, they negligently and without cause left Dixon in Massachusetts jails.

54.    Throughout his imprisonment, Dixon's parents and representatives of his legal counsel contacted Defendants Klienholz, Davis, and Griffith and other members of BCSD many times to advise that Dixon was wrongfully arrested, and that multiple people could account for his whereabouts on the day of the murder.  They refused to entertain any meaningful discussions about

Dixon and rebuffed any attempts to provide exculpatory evidence. On each occasion they declined to receive the information, stating, "they all say that" or "tell it to the judge."

55.     From October 1, 2024, to October 17, 2024, Dixon was housed in the Suffolk County Detention Facility where he first witnessed the true depravity of mankind. Dixon, who is black, was housed with professed nazis and white supremacists, as well as convicted murders, rapists, gang and cartel members and other dangerous inmates. The other inmates in the detention facility acted like animals, and Dixon witnessed multiple fights and beatings. Dixon was scared for his life. His jail cell was very cold with no heat. He was forced to sleep on a hard steel slab of metal, while rats and mice would crawl over him at night.

56.     Dixon did not think it could get any worse—then he was transferred to the South Bay Jail, where he remained from October 17, 2024, until October 31, 2024.

57.     In the South Bay Jail, the conditions were even more deplorable. He was housed alongside the most dangerous inmates, with only three detention guards assigned to nearly 150 inmates. The detention guards would often abuse their authority and humiliate Dixon in front of other inmates. On one occasion, Dixon was required to strip down naked to be searched. Every day and every night in the South Bay Jail, Dixon feared for his life and prayed to the Lord for safety and salvation.

58.     On October 31, 2024, Dixon was transferred from South Bay Jail to the Donald W. Wyatt Detention Center in Central Falls, Maine. After his first day at the Donald W. Wyatt Detention Center, he was placed in solitary confinement without cause or clarification, where he remained for three (3) weeks.

59.     While he remained in solitary confinement, Dixon became disorientated, anxious and suffered a nervous breakdown. At times, Dixon contemplated harming himself through

suicide, as death was better than life.  The small and dark cell that confined Dixon had graffiti written on the walls that sowed discontent and fear. He spent days and weeks trying to rub these messages off the walls with his bare hands–messages like "if you're reading this, the ghost of the guy that died in here will haunt you at night" and "rot in hell."  The only sound Dixon could hear was other inmates yelling and screaming in misery.  When Dixon was allowed to leave this cell to take a shower, he was shackled to another cage that allowed water to run over his body.  When he was allowed recreation time, he was confined to sitting shackled in another cage.

60.     On November 20, 2024, Dixon was driven to New York for purposes of boarding "Con Air" where he was flown to Grady County jail in Chickasaw, Oklahoma with other inmates. Dixon was detained in Oklahoma from November 20, 2024, until November 24, 2024.

61.     On November 25, 2025, Dixon was transported on "Con Air" from Oklahoma to Georgia and booked into the Irwin County Detention Center, in Ocilla, Georgia, where he remained until December 6, 2024.  While locked up in the Irwin County Detention Center, one of his cellmates had smuggled illegal drugs and contraband into the cell, leaving Dixon in fear that he would be arrested for possession of contraband.

62.     On December 6, 2024, Dixon was transported from the Irwin County Detention Center to Columbia, South Carolina, where he was picked up by deputies of BCSD.

63.     Upon arriving at the BCSD in Barnwell County on the afternoon of December 6, 2024, Dixon was subjected to the same degrading process of paperwork, fingerprinting, photographing, and physical examination which had occurred at each of the prior jail facilities. Afterwards, Dixon was placed in an interrogation room, two BCSD's officers, including Lt. Matthew Davis, explained they were investigating a murder that had taken place on October 15, 2023, and that they had a warrant charging him with murder and other felonies related to that

incident. Dixon protested his innocence, reminding the officers that his parents, his lawyer and legal investigator had been contacting the Sheriff's Department numerous times to explain that the wrong person had been arrested, with evidence proving his whereabouts at the time of the murder supported by dozens of witnesses. After a short discussion, the BCSD officers left the room, returning minutes later to advise Dixon he was mistakenly arrested and would be transported home.

64.     Dixon was falsely arrested for a total of sixty-seven days, from September 30, 2024, to December 6, 2024, and during such time he suffered a deprivation of his liberties and freedom that resulted in physical, mental, and emotional injuries, mental pain and suffering, emotional anguish, fear, shock, depression, anxiety, and a loss of enjoyment of life. The injuries will foreseeably continue in the future.

65.     Further, Dixon has incurred legal defense costs, costs to retrieve belongings seized at Logan International Airport, lost wages and earning capacity.

66.     In the weeks following the release of Dixon, BCSD arrested Tyren Rommell Dickson for the murder of Jasmine Roach on October 15, 2023, in Barnwell County.

67.     The best illustration of the cruel turn of fate caused by the abject incompetence of law enforcement is a simple exercise – a comparison of Plaintiff Dixon to Tyren Rommel Dickson who looks nothing like Dixon. Photographs of Plaintiff Dixon and the real suspect Tyren Rommel Dickson are below:

 

**Plaintiff— Ty'Ran Tyrell Dixon**          **Accused—  Tyren Rommel Dickson**

Height 6'3 - Weight 295 lbs.          Height 6'1 - Weight 180 lbs.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983 False Arrest & Malicious Prosecution Against all Defendants)

68.    Dixon reiterates each and every allegation above as if repeated verbatim herein.

69.    At all times mentioned herein, the Defendants acted under the color of state law and in the course and scope of their official government duties.

70.    The rights of the Dixon were clearly established.

71.    The arrest warrant was obtained through false statements and omissions without any probable cause to arrest Dixon.

72.    Defendants acts and omissions deprived and violated Dixon's rights afforded to him under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and federal law as set forth herein:

      a.    In ignoring and disregarding actual information within hours of the incident of the alleged suspect, Tyren Rommel Dickson, yet still falsely arresting Dixon;

      b.    misidentifying Dixon;

17

c.     By obtaining a warrant for Dixon's arrest based on knowingly false and inaccurate information;

d.     By arresting Dixon in the absence of probable cause;

e.     By failing to investigate, obtain, and/or follow up on exculpatory evidence;

f.     By causing Dixon to be detained unlawfully;

g.     By initiating prosecution against Dixon in the absence of probable cause;

h.     By violating Dixon's right to be free from state-created or state-enhanced danger;

i.     By subjecting Dixon to differing and unique treatment as compared to others similarly situated without any rational basis for doing so, and for arbitrary, vindicative, or malicious reasons;

j.     Defaming Dixon which caused an accompanying loss of liberty or property;

k.     By otherwise initiating, continuing, and failing to take steps within their power to cease illegal criminal processes against and detention of Dixon.

l.     Upon the seizure and detention of Dixon, the failure to make any effort by zoom, telephone, local law enforcement, or by travel of the Defendants to Boston to interview him;

m.     Upon the travel to Boston, the failure not to interview Dixon, but to seize his cell phone (presumably for analysis), and the securing of possession of Dixon's phone, the failure by the Defendants to expeditiously analyze the phone for text messages, calls, and photographs which would have immediately revealed Dixon's whereabouts on the date and at the time of the murder;

n.     Upon the waiver of extradition by Dixon on September 30, 2024, the failure of the Defendants to travel or order travel immediately to Boston to take custody of Dixon for his return to South Carolina for interrogation and further investigation, but instead BCSD abdicated that responsibility to the U.S. Marshals Service, knowingly protracting his detention out of state, extending his time of custody, and guaranteeing extended wrongful detention;

o. In negligently selecting a method to recover Dixon from out of state custody after his waiver of extradition, a fact made known to Defendants immediately upon that election, thereby extending his detention, postponing the moment of discovery of his innocence, and violating his due process rights;

p. In failing to consider and receive from Dixon's family and their attorney and investigator after several attempts by Dixons' legal counsel and family to provide exculpatory and alibi evidence proving the Defendants had arrested the wrong person;

q. The Defendants failed to properly review their investigative conclusions by reevaluation and further investigation to prevent wrongful detention of Dixon;

r. In failing to use the care required under the circumstances in the investigation, arrest, detention, and transportation of Dixon;

s. In failing to use the care required under the circumstances in entering the information regarding the warrant and Dixon into the NCIC database;

t. In failing to properly train, monitor and supervise personnel, agents, and/or employees so as to ensure the safety of the public they encounter;

u. Failing to follow and adhere to applicable policies, standards, laws, and protocols; and

v. In other such particulars as may be revealed in discovery and at the trial of this case.

73. Dixon has been injured as a direct and proximate result of BCSD's multiple acts and omissions of negligence and is entitled to an award of damages.

74. Dixon is entitled to an award of attorney's fees and costs.

## <u>SECOND CAUSE OF ACTION</u>
### (42 U.S.C. § 1983 Supervisory Liability Against Defendant Steven Griffith)

75. Dixon reiterates each and every allegation above as if repeated verbatim herein.

76. Dixon was detained and restrained as a proximate result of multiple and separate occurrences of Defendant Steven W. Griffith's acts and omissions.

77. Defendant Griffith had actual knowledge within twelve hours of Jasmine Roach's murder that Tyren Dickson was a suspect.

78. Upon information and belief, Defendant Griffith did not share this information with any members of the Barnwell County Sheriff's Department, including those investigating Jasmine Roach's murder.

79. Defendant Griffith's failure to notify others of the incriminating information and identification of Tyren Dickson was one of the negligent acts and omissions that led to the unlawful arrest and false imprisonment of Dixon.

80. Furthermore, Defendant Griffith has failed to properly train and supervise the employees of the Barnwell County Sheriff's Department, specifically, the officers employed in the investigation unit.

81. Defendant Griffith has created a culture at Barnwell County Sheriff's Department of quick, fast and incomplete criminal investigations that lead to the arrest, detainment and possible convictions of innocent individuals.

82. Defendant Griffith has failed to adopt well-promulgated policies and well-established customs and practices to ensure the Barnwell County Sheriff's Department are conducting thorough criminal investigations.

83. Defendant Griffith perpetuates incomplete and inaccurate police investigations by failing to ensure his investigating officers are thoroughly trained in criminal investigations.

84. Defendant Griffith further fails to ensure the officers employed with Barnwell County Sheriff's Department utilize any training they do receive when conducting criminal investigations.

85.     Upon information and belief, the policy and practice of Defendant Griffith is such that incidents of misconduct are overlooked and directly or indirectly encouraged.

86.     Defendant Griffith's failure to properly train his staff, and his failure to ensure his staff utilizes any trainings they receive, led to the wrongful arrest and detention of Dixon.

87.     Dixon has been injured as a proximate result of the Defendants multiple acts and omissions of wrongdoing leading to Dixon's wrongful imprisonment and detention, and therefore, he is entitled to an award of damages.

88.     Dixon is entitled to an award of attorney's fees and costs.

WHEREFORE, Dixon pray this Honorable Court for judgment against Defendants, jointly and severally, for all legally cognizable actual and punitive damages, attorney fees and costs, and for such other and further legal and equitable relief as this Honorable Court may deem just and proper.

**[SIGNATURE PAGE TO FOLLOW]**

Respectfully submitted,

By:     */s/ Robert F. Goings*
        Robert F. Goings (Fed ID Bar # 9838)
        Morgan Drapeau (Fed ID Bar # 13452)
        Goings Law Firm, LLC
        1510 Calhoun Street
        Columbia, South Carolina 29201
        Telephone:  803-350-9230
        Email: rgoings@goingslawfirm.com
            mdrapeau@goingslawfirm.com

        */s/ Joseph M. McCulloch*
        Joseph M. McCulloch (Fed. ID No. 2785)
        Kathy R. Schillaci (Fed. ID No. 7792)
        McCulloch & Schillaci, Attorneys at Law
        1116 Blanding Street, Suite 1
        P.O. Box 11623 (29211)
        Columbia, South Carolina 29201
        Telephone:  803-779-0005
        Email: joe@mccullochlaw.com
            kathy@mccullochlaw.com

        **ATTORNEYS FOR PLAINTIFF**

Columbia, South Carolina        **CIVIL RIGHTS COMPLAINT**
        **JURY TRIAL DEMANDED**

August 6, 2025